## In re BALDWIN–UNITED CORPORATION (SINGLE PREMIUM DEFERRED ANNUITIES INSURANCE LITIGATION)

**Alaska, Arizona, California, Colorado, Connecticut, Florida, Hawaii, Idaho, Illinois, Iowa, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Washington and Wisconsin, Appellants,**

**Maine Attorney General James E. Tierney, Intervenor-Appellant.**

**Nos. 1341, 1756, Dockets 85–5042, 85–5046.**

United States Court of Appeals, Second Circuit.

Argued May 21, 1985.

Decided Aug. 19, 1985.

Richard Carlton, New York City (Melanie L. Cyganowski, Sullivan & Cromwell, New York City, of counsel), for defendant-appellee Kidder, Peabody & Co., Inc. and Defendants' Liaison Counsel.

David J. Bershad, New York City (Lawrence Milberg, Milberg Weiss Bershad Specthrie & Lerach, New York City, Marvin A. Miller & Associates, Ltd., Chicago, Ill., Saul, Ewing, Remick & Saul, Philadelphia, Pa., Berger & Montague, P.C., Philadelphia, Pa., Susman, Godfrey & McGowan, Houston, Tex., Greenfield & Chimicles, Haverford, Pa., of counsel), for plaintiffs-appellees and Plaintiffs' Steering Committee.

Cahill Gordon & Reindel, New York City (Charles A. Gilman, New York City, of counsel), for defendants-appellees Smith Barney, Harris Upham & Co., Inc. and other Broker-Dealers.

John Donohue, Chief, Ins. Div., Com. of Massachusetts, Boston, Mass. (Francis X. Bellotti, Atty. Gen. of the Com. of Massachusetts, Deborah Hiatt, Virginia Hoefling, Asst. Attys. Gen., Ins. Div., Boston, Mass., Paul O'Dwyer, O'Dwyer & Bernstien, New York City, of counsel), for appellant States.

James E. Tierney, Atty. Gen. of the State of Maine, Augusta, Me. (Peter J. Brann,

Asst. Atty. Gen., Leanne Robbin, Asst. Atty. Gen., Augusta, Me., of counsel), for intervenor-appellant.

Before PRATT and MANSFIELD, Circuit Judges, and MacMAHON, District Judge.[*]

MANSFIELD, Circuit Judge:

Thirty-one states appeal a preliminary injunction issued in the Southern District of New York by Judge Charles L. Brieant, Jr. in the course of a consolidated, multi-district, class action against various broker-dealers who sold securities of the now-bankrupt Baldwin-United Corporation and its insurance subsidiaries. Appellants, with the exception of the State of Maine, were neither parties to nor intervenors in the district court proceedings below. They object on procedural and constitutional grounds to the injunction, which enjoins them as "persons having actual knowledge of this Order," from "commencing any action or proceeding" against any defendants in the multi-district litigation (MDL 581) that "may in any way affect the right of any plaintiff or purported class member in any proceeding under" MDL 581. Appellees include both the plaintiffs and the defendants in the federal class action. Because we find that the issuance of the injunction was within the scope of the district court's power and was not an abuse of its discretion, we affirm.

MDL 581, pending before Judge Brieant, represents the consolidated proceedings of more than 100 federal securities lawsuits. Plaintiffs, some 100,000 holders of Baldwin single-premium deferred annuities (SPDAs), have asserted claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 against 26 broker-dealers and related individuals who sold the SPDAs by representing them to be safe and desirable investments. Many of the plaintiffs have also raised pendent state law claims, such as consumer protection actions under statutes providing private rights of recovery. All these claims are

* Of the United States District Court for the Southern District of New York, sitting by designation.

designed to obtain additional recoveries beyond the amounts that plaintiffs will eventually receive under a rehabilitation plan for Baldwin's insurance subsidiaries that took effect in May 1984. Of the 100,000 or so in the plaintiff class less than 400 chose to opt out of the action.

During the past two years the district court has coordinated settlement talks between the parties. Negotiations proved successful as to 18 of the 26 broker-dealer defendants and stipulations of settlement were signed in September 1984 providing for payment of approximately $140 million to the plaintiffs in exchange for a release of all the plaintiffs' federal claims against the settling defendants as well as any claims available to each plaintiff under relevant state laws. This money is to be used in a Global Enhancement Plan, the terms of which are being separately negotiated by the parties. The Plan would provide the SPDA holders with a replacement investment property that would supplement their recovery under a rehabilitation plan. If no such agreement should be reached, the settlement money would be distributed as a lump sum to SPDA holders. Only about 50 individual plaintiffs objected to this settlement. For the purpose of ruling on these settlements, the district court provisionally approved class status, 105 F.R.D. 475.

On hearing of the proposed settlements the representatives of 40 states in the National Association of Attorneys General (NAAG), concluded that the proposal did not adequately compensate plaintiffs for their federal and state law claims. The states were also concerned about violations by the Baldwin companies of various state regulatory and criminal laws enforced by each state's attorney general. Following a meeting of the concerned NAAG members, the Maine Attorney General petitioned on behalf of the relevant NAAG subcommittee to be added to the service list in the suit. One month later, the district court preliminarily approved the settlement and scheduled a hearing on its fairness.

Meanwhile, between the time when the stipulations of settlement were signed and the year's end, some 10 states had issued subpoenas or other requests for information from various defendants. The states' objective, as revealed in some draft complaints and conceded by them upon oral argument of this appeal,[1] is to enforce

---

1. Upon argument of the present appeal the states confirmed their desire to use state proceedings to obtain additional money, over and above the settlement amounts, for distribution to members of the class in the consolidated federal actions:

 "JUDGE MANSFIELD: I understand, but what I am trying to find out is whether you or the sovereigns, the states, are trying to get money to this class by using some sort of proceedings for that purpose or whether they are simply trying to enforce their own criminal and regulatory laws.

 "MR. DONOHUE: Your Honor, I can't specifically speak for specific action each of the 30 states. What I am stating is that the states are seeking to be able to make that choice under their state laws. Each of the states has a wide range of law they can pursue, some of which might bring additional monetary relief to these consumers, and the states want to be able to make that choice when they are acting in their sovereign capacity.

 \* \* \* \* \* \*

 "JUDGE PRATT: If he [the state Attorney General] is suing for restitution, which is what they [the defendants] seem to be afraid of here—they don't want to pay double damages—why is that in the sovereign name of the state? When they get the money they are going to turn it over to the people who have been hurt by the conduct.

 "MR. DONOHUE: That is right, but we believe the state in making the choices, the best way to enforce its laws, can choose to take back the unjust profits, to take back the restitution that the consumers deserve. We don't believe that it would be a double recovery. Here the consumers have not gotten a hundred cents on the dollar.

 "JUDGE PRATT: You have accepted what they have gotten as a fair adjustment of the dispute.

 "MR. DONOHUE: Of their private claims.

 "JUDGE PRATT: You are saying it isn't fair, you want more money.

 "MR. DONOHUE: We are saying the states have the right to pursue the remedies in the state's name.

 "JUDGE PRATT: Pursue the individual's remedy in the state's name.

 "MR. DONOHUE: We don't believe it is the individual's remedy.

 "JUDGE MANSFIELD: Who would get the money?

state laws authorizing them in their representative capacities to seek restitution and monetary recovery from the defendants to be paid over to those of the states' citizens who are plaintiffs in the consolidated class actions before Judge Brieant. In addition, some states may wish to pursue other state remedies, including prospective injunctive relief and enforcement of state criminal and regulatory laws designed to guard against repetition of the conduct forming the basis of the consolidated federal actions.

After an unsuccessful meeting in late January 1985 between certain state representatives and the defendants in which the states sought a higher settlement figure in exchange for the termination of all proposed state administrative proceedings and civil litigation against the defendants, 22 states, including about half of the appellant states, submitted an amicus brief opposing the settlements as inadequate. No state intervened except Maine, which did so for the purpose of commenting on the fairness of the settlement. In mid-February, several defendants received from the State of New York notices of its intent to bring a suit seeking restitution for New York citizens who held Baldwin SPDAs. These defendants moved the district court to enjoin the imminent New York actions.

Following the grant of a temporary restraining order and a hearing on the need for injunctive relief, the district court on February 26, 1985, orally approved an injunction. The judge stated that the injunction was necessary "in aid of preserving [the court's] jurisdiction" pursuant to the All-Writs Act, 28 U.S.C. § 1651 (1982) and Fed.R.Civ.P. 23(d). In support of this conclusion he found that the impending suits in state court "are likely to impair this federal court's jurisdiction and ... to impair the judgments to be made in these on-going cases, both as to the adequacy and fairness of the settlements proposed

by the parties to the settling action, and insofar as concerns the conduct and adjudication of the eight nonsettling actions." In his view, the settlement negotiations would be "frustrated by reason of the existence of competitive litigation, [such that] it would simply be impossible to implement them if they be approved, or to proceed with the class actions if ... this court concludes to proceed on the merits." The judge further found that the existence of actions in state court would jeopardize its ability to rule on the settlements, would substantially increase the cost of litigation, would create a risk of conflicting results, and would prevent the plaintiffs from benefiting from any settlement already negotiated or from reaching a new and improved settlement in the federal court.

Recognizing the states' interests in enforcing their laws, Judge Brieant stated that it was to be "absolutely clear that the injunction will not extend to the enforcement of the criminal law against anybody who may be deemed to have violated it, and it will not extend to a request of a state court for prospective injunctive relief as to any business practice on the part of any defendant." The court provided that if it eventually denied class action status, it would modify the injunction so that the states would be free to bring actions representing non-party class members.

A proposed order was drawn up by defendants and served on the New York Attorney General, as representative of the amici states, on the Maine Attorney General as the NAAG representative, and on various state insurance officials. At the hearing about the form of the order, the defendants sought to bind all persons with notice of the order, while the State of Maine submitted language that would only have enjoined those acting "in concert" with New York.

"MR. DONOHUE: We agree that one of the options or remedies of the states would be to get the money to these people, but the state is suing in its own name and that is one of the choices the state has. Often in going after an action one of the most effective ways to make sure that someone is punished or does not do it again is to make sure that they don't get to keep what they obtained from their illegal conduct."

Judge Brieant issued the injunction on March 19, 1985. The order enjoins the New York Attorney General and "all other persons having actual knowledge of th[e] Order" from

"commencing any action or proceeding of any kind against any defendant ... on behalf of or derivative of the rights of any plaintiff or purported class member ... or which action or proceeding may in any way affect the rights of any plaintiff ... or which action or proceeding seeks money damages arising out of the sale to any plaintiff ... [of the Baldwin annuities] ... or which action or proceeding seeks any declaratory relief with respect to any of the above...."

To protect the rights of the states, the order included a clause providing that the injunction did

"not extend to the commencement of any action ... which seeks prospective injunctive relief as to any unlawful business practice on the part of any defendant ... or which seeks to exercise in any way all other state law enforcement and regulatory powers, so long as any such action ... does not seek to in any way affect the rights of any plaintiff or purported class member in any proceeding under MDL 581."

The complete text of the injunction appears in Appendix A hereto. The injunction was to continue in effect until the entry of final judgment in all of the multidistrict proceedings.

The defendants served a copy of the injunction on every state attorney general. Just a few days later, the defendants sought an order to show cause alleging contempt by the Georgia Attorney General, who, they claimed, was about to commence an action in violation of the injunction. The Georgia action, under that State's RICO statute, sought a forfeiture to the State. After a hearing, the district court denied the motion for a preliminary injunction against Georgia and ruled the contempt motion withdrawn, in view of an agreement by Georgia to postpone action for 45 days. A similar effort by defend-

ants to forestall action by Ohio occurred some days later, and Judge Brieant stayed a license revocation hearing for a month before ruling on defendants' motion.

In mid-April the states unsuccessfully moved the district court for a stay of the injunction pending appeal. The hearing on that motion was marked by conflict between the participants, with the states refusing on sovereign immunity grounds any request that they specify what conduct they wished to pursue that would be foreclosed to them by the injunction. Thirty states then filed the present appeal and sought a stay from this court, although they withdrew that motion when the appeal was expedited. Maine appealed separately, but that appeal was initially dismissed. Then, on June 13, 1985, Maine successfully sought to have its appeal reinstated and consolidated with the present appeal of the other states. Meanwhile, on May 1, 1985, the district court approved the proposed settlements as fair, reasonable and adequate, and entered final judgments in 18 of the 26 consolidated class actions. 607 F.Supp. 1312.

## DISCUSSION

■ A preliminary injunction will be overturned only when the district court abuses its discretion. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Application of U.S. In Matter of Order Authorizing the Use of a Pen Register,* 538 F.2d 956, 961 (2d Cir.1976) (All-Writs Act), *rev'd on other grounds sub nom. United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). An abuse of discretion may be found when the district court relies on clearly erroneous findings of fact or on an error of law in issuing the injunction. *See Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 315–16 (2d Cir.1982); *see also Anderson v. City of Bessemer City,* — U.S. —, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ Before reaching the merits of this case we address two threshold issues.

First, contrary to appellees' contention, this appeal is not premature. Although appellants did not seek relief from the injunction in the district court except to ask for a stay pending appeal, we are persuaded that it would have been futile for the states to do so. *See* 11 C. Wright & A. Miller, Federal Practice & Procedure § 2908, at 332–33 (1973). It was sufficient that appellants sought a stay below. The authorities cited by appellees are not to the contrary. *See, e.g., Robertson v. National Basketball Association*, 556 F.2d 682, 687 (2d Cir.1977) (refusing to rule on an injunction when a motion to clarify the injunction was pending in the district court). Second, contrary to appellants' argument the states have standing to challenge the injunction, since it imposes direct restrictions on their activities. *See Thompson v. Freeman*, 648 F.2d 1144, 1147 n. 5 (8th Cir.1981).

*Authority for the Issuance of the Injunction*

■ Federal courts have authority under the All-Writs Act, 28 U.S.C. § 1651 (1982), to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." In determining whether the injunction was a permissible exercise of Judge Brieant's authority under the All-Writs Act, we look both to cases interpreting this Act and also to cases interpreting similar language appearing in the Anti-Injunction Act, 28 U.S.C. § 2283 (1982). The latter statute bans injunctions against actions pending in state court, subject to specified exceptions, including an exception for injunctions "necessary in aid of [the federal court's] jurisdiction." While the parties agree that the Anti-Injunction Act is inapplicable here since the injunction below issued before any suits were commenced in state court, *see Dombrowski v. Pfister*, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 (1965), cases interpreting this clause of the Anti-Injunction Act have been helpful in understanding the meaning of the All-Writs Act. *See, e.g., United States v. District of Columbia*, 654 F.2d 802, 809 n. 16 (D.C.Cir.), *cert. denied*, 454 U.S. 1082,

102 S.Ct. 637, 70 L.Ed.2d 616 (1981); *see also* 1A J. Moore, Moore's Federal Practice, § 0.208[1], at 2404 n. 1 (1982); *id.* § 0.208[2A], at 2315–16.

■ We do not find independent authority for the issuance of the injunction in the Fed.R.Civ.P. 23(d) provision empowering the district judge to issue orders appropriate "for the protection of the members of the class or otherwise for the fair conduct of the action"; that rule is a rule of procedure and creates no substantive rights or remedies enforceable in federal court. *See Piambino v. Bailey*, 610 F.2d 1306, 1331 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980).

■ When a federal court has jurisdiction over its case in chief, as did the district court here, the All-Writs Act grants it ancillary jurisdiction to issue writs "necessary or appropriate in aid of" that jurisdiction. This provision permits a district court to enjoin actions in state court where necessary to prevent relitigation of an existing federal judgment, *see United States v. New York Telephone, supra*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977); *SEC v. G.C. George Securities, Inc.*, 637 F.2d 685, 688 (9th Cir.1981), notwithstanding the fact that the parties to the original action could invoke res judicata in state courts against any subsequent suit brought on the same matters. *See Redac Project 6426, Inc. v. Allstate Ins. Co.*, 412 F.2d 1043, 1047–48 (2d Cir.1969). Even before a federal judgment is reached, however, the preservation of the federal court's jurisdiction or authority over an ongoing matter may justify an injunction against actions in state court. Such "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970) (dicta) (Anti-Injunction Act); *see In re: Corrugated Container*

*Antitrust Litigation,* 659 F.2d 1332, 1334–35 (5th Cir.1981) (Anti-Injunction Act) (upholding an injunction, issued by a federal judge presiding over multi-district litigation, against actions by the same plaintiffs in state court), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982); *cf. James v. Bellotti,* 733 F.2d 989, 994 (1st Cir.1984) (indicating that the existence of a provisionally-approved settlement would justify a protective injunction against state court suits brought by the same parties).

■■■ On the other hand, the mere existence of a parallel lawsuit in state court that seeks to adjudicate the same *in personam* cause of action does not in itself provide sufficient grounds for an injunction against a state action in favor of a pending federal action. *See Vendo Co. v. Lektro-Vend Corp.,* 433 U.S. 623, 642, 97 S.Ct. 2881, 2893, 53 L.Ed.2d 1009 (1977) ("We have never viewed parallel *in personam* actions as interfering with the jurisdiction of either court."); *Kline v. Burke Construction Co.,* 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226 (1922); *Heyman v. Kline,* 456 F.2d 123, 131 (2d Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972); *Vernitron Corp. v. Benjamin,* 440 F.2d 105, 108 (2d Cir.) (stating that an injunction may be issued under the Anti-Injunction Act only if a "real or potential conflict threatens the very authority of the federal court"), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1664, 29 L.Ed.2d 154 (1971). This principle does not apply when federal courts have jurisdiction over a res in an in rem action; in such a case, because the "exercise by the state court of jurisdiction over the same *res* necessarily impairs, and may defeat, the jurisdiction of the federal court already attached," the federal court is empowered to enjoin any state court proceeding affecting that res. *Kline v. Burke Construction Co., supra,* 260 U.S. at 229, 43 S.Ct. at 81.

Here the findings of the district court that the injunction was necessary to preserve its jurisdiction and protect its judgments, if sustainable, would be sufficient to justify the issuance of the injunction under the All-Writs Act. We must therefore examine whether the district court's finding that the maintenance of actions in state court would impair its jurisdiction and authority over the consolidated federal multidistrict actions was clearly erroneous.

At the time when the injunction issued the parties in 18 of the 26 class actions had reached stipulated settlements that had been provisionally approved by the court and were awaiting final court approval, and the parties in the remaining 8 suits were continuing settlement negotiations. Final judgments in the 18 settling actions were entered shortly after the injunction issued. As for the defendants participating in the stipulated settlements, we conclude that the injunction was "necessary or appropriate in aid of" the court's jurisdiction. There is no question that an injunction could have been appropriately ordered after the 18 final federal judgments were entered, since it would properly have forestalled relitigation of those judgments. Because, as a condition of the settlement, the plaintiffs agreed to release all claims arising under federal and state law on account of the purchase of the Baldwin SPDAs from the settling defendants, such a post-settlement injunction would have barred the states from bringing state law claims derivative of the plaintiffs' rights. *See TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460–62 (2d Cir.1982) (finding it permissible for a judgment on a settlement to bar later claims based on the "identical factual predicate" as that under the settled claims); *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9, 18 n. 7 (2d Cir.1981) (assuming explicitly that a class action settlement could provide for the release of claims relying on different theories than those stated in the class action complaint, so long as the released claims relied on the same set of facts). Were this not the case, the finality of virtually any class action involving pendent state claims could be defeated by subsequent suits brought by the states asserting rights derivative of those released by the class members. For instance, as a practical matter no defendant

in the consolidated federal actions in the present case could reasonably be expected to consummate a settlement of those claims if their claims could be reasserted under state laws, whether by states on behalf of the plaintiffs or by anyone else, seeking recovery of money to be paid to the plaintiffs. Whether a state represented itself to be acting as a "sovereign" in such a suit or described its prayer as one for "restitution" or a "penalty" would make no difference if the recovery sought by the state was to be paid over to the plaintiffs. The effect would be to threaten to reopen the settlement unless and until it had been reduced to a judgment that would have res judicata consequences.

We recognize that under the line of cases typified by *Kline v. Burke Construction Co., supra,* until the issuance of a final federal judgment the pendency of duplicative *in personam* actions in state court—even those actions derivative of the rights of parties to the federal action—would not ordinarily justify enjoining the state court actions. Here, however, the potential for an onslaught of state actions posed more than a risk of inconvenience or duplicative litigation; rather, such a development threatened to "seriously impair the federal court's flexibility and authority" to approve settlements in the multi-district litigation. *Atlantic Coastline R.R. v. Brotherhood of Locomotive Engineers, supra,* 398 U.S. at 295, 90 S.Ct. at 1747. The circumstances faced by Judge Brieant threatened to frustrate proceedings in a federal action of substantial scope, which had already consumed vast amounts of judicial time and was nearing completion. Some 100,000 plaintiffs participated as parties in the action, compared to a mere 50 who chose to opt out. Settlement negotiations in the federal court had been under way for many months, agreements had been reached, and all that remained was approval of the settlement by the district court. Several evidentiary hearings on the settlement had been held, featuring testimony by representatives of the plaintiffs, the defendants, and various state agencies. The district court had before it thousands of pages of materials regarding the rehabilitation proceedings in courts in Arkansas and Indiana. In contrast, although the Baldwin bankruptcy occurred in 1983, the states waited until the eve of settlement approval to take any significant actions against the broker-dealers.

The existence of multiple and harassing actions by the states could only serve to frustrate the district court's efforts to craft a settlement in the multidistrict litigation before it. The success of any federal settlement was dependent on the parties' ability to agree to the release of any and all related civil claims the plaintiffs had against the settling defendants based on the same facts. If states or others could derivatively assert the same claims on behalf of the same class or members of it, there could be no certainly about the finality of any federal settlement. Any substantial risk of this prospect would threaten all of the settlement efforts by the district court and destroy the utility of the multidistrict forum otherwise ideally suited to resolving such broad claims. To the extent that the impending state court suits were vexatious and harassing, our interest in preserving federalism and comity with the state courts is not significantly disturbed by the issuance of injunctive relief. *See In re: Corrugated Container Antitrust Litigation, supra,* 659 F.2d at 1335.

Thus the need to enjoin conflicting state proceedings arises because the jurisdiction of a multidistrict court is "analogous to that of a court in an in rem action or in a school desegregation case, where it is intolerable to have conflicting orders from different courts." 17 C. Wright & A. Miller & E. Cooper, *supra,* § 4225 at 105 n. 8 (Supp. 1985). In effect, unlike the situation in the *Kline v. Burke Construction Co.* line of cases, the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control. Similar authority for the injunction comes from the court's power to protect and effectuate its order provisionally approving the 18 settlements. *See James*

*v. Bellotti, supra,* 733 F.2d at 994. *See also In re: Corrugated Container Antitrust Litigation, supra,* 659 F.2d at 1334–35.

Under the circumstances we conclude that the injunction protecting the settling defendants was unquestionably "necessary or appropriate in aid of" the federal court's jurisdiction. Although the question is closer as to the application of the injunction to the 8 defendants who have not yet settled, we cannot find that the injunction was erroneous as to them. Given the extensive involvement of the district court in settlement negotiations to date and in the management of this substantial class action, we perceive a major threat to the federal court's ability to manage and resolve the actions against the remaining defendants should the states be free to harass the defendants through state court actions designed to influence the defendants' choices in the federal litigation. So long as there is a substantially significant prospect that these 8 defendants will settle in the reasonably near future, we conclude that the injunction entered by the district court is not improper. If, however, at some point in the continued progress of the actions against the remaining 8 defendants it should appear that prompt settlement was no longer likely, we anticipate that upon application the injunction against parallel actions by the states might be lifted; in that event the situation would fall within the *Burke v. Kline Construction Co.* rule that *in personam* proceedings in state court cannot be enjoined merely because they are duplicative of actions being heard in federal court. That situation, however, does not presently exist.

Having found the injunction necessary and appropriate in aid of the district court's jurisidiction we conclude that it is no less valid because it applies to states other than New York. An important feature of the All-Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction. *See, e.g., United States v. New York Telephone Co., supra,* 434 U.S. at 174, 98 S.Ct. at 373 ("The power conferred by the Act, extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, [citations omitted], and encompasses even those who have not taken any affirmative action to hinder justice."); *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 129 n. 6 (2d Cir.1979) (dicta); *United States v. Hall,* 472 F.2d 261, 265 (5th Cir.1972) (upholding a contempt citation based on an injunction enjoining a non-party in a school desegregation case from causing disruption on the school campus because the "integrity of the court's power to render a binding judgment in an action over which it has jurisdiction [was] at stake"). The power to bind non-parties distinguishes injunctions issued under the Act from injunctions issued in situations in which the activities of the third parties do not interfere with the very conduct of the proceeding before the court. *See, e.g., Thompson v. Freeman, supra,* 648 F.2d at 1147–48 (8th Cir.1981) (vacating a permanent injunction entered against a non-party on the merits); *G. & C. Merriam Co. v. Webster Dictionary Co.,* 639 F.2d 29, 34–35 (1st Cir.1980); *Heyman v. Kline,* 444 F.2d 65, 66–67 (2d Cir.1971); *Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 832–33 (2d Cir.1930).

While the issuance of the injunction here did not comply with the requirements that Fed.R.Civ.P. 65 prescribes for the issuance of preliminary injunctions, this is not a fatal defect. Injunctions issued under the authority of the All-Writs Act stem from very different concerns than those motivating preliminary injunctions governed by Fed.R.Civ.P. 65. Preliminary injunctions under Rule 65 are designed to preserve the status quo between the parties before the court pending a decision on the merits of the case at hand. In contrast, injunctions such as that issued here are needed to prevent third parties from thwarting the court's ability to reach and

resolve the merits of the federal suit before it. Moreover, there is a difference between the power to enjoin an unrelated non-party pursuant to the All-Writs Act and the narrower authority delineated by Rule 65(d), which confines the application of injunctions to parties, "their officers, agents, servants, employees, and attorneys, and [to] those persons in active concert or participation with them who receive actual notice of the order." We do not believe that Rule 65 was intended to impose such a limit on the court's authority provided by the All-Writs Act to protect its ability to render a binding judgment. *See United States v. Hall, supra,* 472 F.2d at 266; *see also Herrlein v. Kanakis,* 526 F.2d 252, 255 (7th Cir.1975). We do not read *Florida Medical Association v. U.S. Department of HEW,* 601 F.2d 199, 202 (5th Cir.1979), as being to the contrary since unlike the situation here it involved an injunction going to the merits of the case in chief. We therefore do not reach the question whether the states were acting in concert with New York within the meaning of Rule 65.

■■■■ Although Rule 65 does not apply to injunctions issued under the All-Writs Act against non-parties whose actions would impair the court's jurisdiction, we do not abandon the requirements that an injunction be specific and definite enough to apprise those within its scope of the conduct that is being proscribed, *see Diapulse Corp. of America v. Carba, Ltd.,* 626 F.2d 1108, 1111 (2d Cir.1980), and that those subject to the injunction receive appropriate notice of its terms. The normal standard of specificity required for an injunction is that "the party enjoined must be able to ascertain from the four corners of the order precisely what acts" are forbidden. *Sanders v. Air Line Pilots Association,* 473 F.2d 244, 247 (2d Cir.1972). In addition, however, in judging the specificity of an injunction, we will give it "no greater effect than that explicitly attributed to it by the district judge." *See Redac Project 6426, Inc. v. Allstate Insurance Co., supra,* 412 F.2d at 1048. To the extent that there is any doubt we will construe the injunction narrowly. *See* 11 C. Wright & A. Miller, *supra,* § 2955 at 538.

■■■■ Here the injunction without any ambiguity bars the states from undertaking actions of a representative character seeking additional restitution for state residents who purchased SPDAs. The decree excepts from that bar suits for "prospective injunctive relief as to any unlawful business practice" by defendants and efforts to "exercise in any way all other state law enforcement and regulatory powers, so long as any such action ... does not seek to in any way affect the rights of any plaintiff or purported class member in any proceeding under MDL 581". The latter provision, standing alone, might appear to be ambiguous. But when it is read in the context of the entire injunction and of the judge's decision upon issuing the injunction, both of which were served on all the states, the import of this language is clear. In approving the injunction the district court states its "absolute" intent that the injunction not "extend to the enforcement of the criminal law against anybody who may be deemed to have violated it, and ... not extend to a request of a state court for prospective injunctive relief as to any business practice on the part of any defendant." On the other hand, the judge made it equally clear that the injunction is directed at actions by the states seeking "restitution, or any judgment directing restitution, or anything at all adjudicating the rights of the class action members vis-a-vis the selling brokers." This focus was based on his expressed conviction that the state actions were improperly being brought for harassing and vexatious purposes and as a means of coercing the defendants to pay more funds into the federal settlement pool. Against this background, there can be no doubt that the plain meaning and intent of this provision is to bar the states from using state actions as leverage to force the defendants to contribute additional sums to the federal settlement pool. Such a restriction is sufficiently specific to put the states on "explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard,*

414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974).

As for notice the requirements of the All-Writs Act are satisfied if the parties whose conduct is enjoined have actual notice of the injunction and an opportunity to seek relief from it in the district court. *Cf. United States v. Hall, supra,* 472 F.2d at 266–67. These requirements were met here, since each state's attorney general was served with the injunction and since each had the opportunity to present arguments against it to the district court. None sought to introduce evidence. Although it would under many circumstances be desirable for service to be made in advance of any proposed injunction on all non-parties whose conduct would thereby be restricted, we cannot impose such a condition on use of the All-Writs Act. In exercising its powers under that Act, the district court may face circumstances in which such notice is impractical or even impossible. For instance, the type of conduct enjoined here was generally disruptive of the district court proceedings, i.e., actions by states that are derivative of the rights of the plaintiffs in the district court or seeking to change the recoveries to be received by the plaintiffs in settlement of their federal suits. So long as the injunction is limited to those engaged in such conduct with actual notice of the terms of the injunction, as is the injunction here, we cannot say that it must fail for lack of notice, even though it appears that not all of the appellant states were aware in advance that an order of injunction was being entered that would limit their conduct as well as the conduct of the State of New York.

*Sovereign Immunity*

The final question about the validity of the injunction is whether it offends the sovereign immunity of the states. We start with some basic principles. The Eleventh Amendment bars the federal courts from entertaining actions against the states without their consent or that of Congress. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 907–08, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). The Amendment, which is designed to protect the state government's ability to exercise its sovereign functions without the interference of the judiciary, *see Larson v. Domestic and Foreign Corporations,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed.2d 1628 (1949), thus bars suits against a state as the real party in interest, regardless whether the state is nominally included as a defendant. Impermissible suits include those demanding money damages from the state treasury, *see Edelman v. Jordan, supra,* 415 U.S. at 663–67, 94 S.Ct. at 1355–57, as well as suits seeking to enjoin state officials from actions that are unconstitutional or in violation of federal law, *see Cory v. White,* 457 U.S. 85, 91, 102 S.Ct. 2325, 2329, 73 L.Ed.2d 694 (1982); *Worcester County Trust Co. v. Riley,* 302 U.S. 292, 58 S.Ct. 185, 82 L.Ed. 268 (1937); *see also Pennhurst State School and Hospital v. Halderman, supra,* 104 S.Ct. at 910–11 (holding it inappropriate to exercise pendent jurisdiction in order to enjoin state officials from violating only state laws). The All-Writs Act, which is itself limited by the jurisdiction of the federal courts, cannot be used to circumvent or supersede the constitutional limitations of the Eleventh Amendment. *See Missouri v. Fiske,* 290 U.S. 18, 28, 54 S.Ct. 18, 21, 78 L.Ed. 145 (1933) (the purpose of protecting federal jurisdiction does not remove a case from the reach of the Eleventh Amendment); *Commercial Security Bank v. Walker Bank & Trust Co.,* 456 F.2d 1352, 1355 (10th Cir.1972) (the All-Writs Act provides ancillary jurisdiction only when a court's jurisdiction is otherwise proper); *see also* 28 U.S.C. § 1651 (specifying that the authority to issue writs must be "agreeable to the usages and principles of law").

However, certain types of actions involving state interests may nonetheless be heard in federal court. These include suits for injunctive relief against government officials who act in violation of the

U.S. Constitution or federal law, *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).[2] The status for sovereign immunity purposes of actions instituted by state officials in a representative capacity presents a similar exception. To start with, when the state merely asserts the personal claims of its citizens, it is not the real party in interest and cannot claim parens patriae standing. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600, 602, 102 S.Ct. 3260, 3265–66, 73 L.Ed.2d 995 (1982); *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976) (declining to find the state the real party in interest for the purpose of original Supreme Court jurisdiction when the state was attempting to vindicate the individual rights of its citizens); *Oklahoma ex rel. Johnson v. Cook,* 304 U.S. 387, 58 S.Ct. 954, 82 L.Ed. 1416 (1938) (same). Thus, when relief against such representative actions by the state is sought, the state's sovereign immunity is not a bar. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia,* 311 F.Supp. 149 (S.D.N.Y.1970).

 Applying these principles, we conclude that the injunction here does not contravene the Eleventh Amendment. State criminal or regulatory actions, in contrast, are brought in a state's capacity as sovereign. A state's right to pursue such remedies is therefore within the protection of sovereign immunity, unless the state action violates the Constitution or federal law, provided the proceedings are not being used by the state as a means of coercing the defendants into increasing a civil settlement offer to persons who might be represented by the state, *see, e.g.,* 42 U.S.C. § 1983 (1982); 18 U.S.C. § 1951 (1982). Judge Brieant did not make broad factual findings on this latter point. Rather, he properly concluded only that the states would be violating federal law *if* they should bring administrative and criminal proceedings in order to induce the defend-

ants to contribute more toward the settlement being reached in the federal court. His order does not enjoin the states from seeking prospective injunctive relief against unlawful business practices by defendants or from exercising law enforcement or regulatory powers, provided these actions do not "seek to in any way affect the rights of any plaintiff or purported class member in any proceeding under MDL 581."

Thus the injunction only precludes state officials from bringing actions in a de facto or de jure representative capacity on behalf of the plaintiffs in the federal actions. Accordingly, the injunction affects conduct outside the protection of the states' sovereign immunity. Given the clear intent and directive of the injunction and the district court's willingness to advise the states on whether proposed conduct would fall within the bounds of the injunction or not, we cannot say that it was error for Judge Brieant to issue the injunction in the form he chose.

It is true, as the State of Maine points out, that there may be some laws not available to private plaintiffs that enable a given state to bring proceedings seeking restitutionary damages for the benefit of certain of its citizens. *See, e.g.,* Me.Rev.Stat. Ann.tit. 5, § 209 (Supp.1984–85) (providing that in an action brought by the state to declare a practice unlawful the court may "make such other orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss by reason" of the unlawful practice "any moneys or property ... which may have been acquired by means of such method"). However, the invocation of such a restitutionary remedial provision does not cause the claim to lose its representative character. Although only the state can act under the state statute, its claim is essentially derivative. Any recovery would not go to the state but ultimately to the plaintiffs-in-

---

**2.** A risk of directly inconsistent rulings concerning an individual's rights will not alone, however, permit an exception to be made to sovereign immunity. *See Cory v. White, supra,* 457 U.S. at 91, 102 S.Ct. at 2329; *Worcester County Trust Co. v. Riley, supra,* 302 U.S. 292, 58 S.Ct. 185, 82 L.Ed. 268.

vestors in the federal action, who are the real parties in interest.

Having rejected the state's objections to the district court's injunction, we affirm.

### APPENDIX A

"IT IS HEREBY ORDERED THAT the Attorney General of the State of New York, Robert Abrams, individually and in his official capacity, and all other persons acting for the Attorney General in either capacity, and the State of New York, acting through its Attorney General, its officials, officers, agents, servants, representatives and employees, and all other persons acting under it, in concert with it or on its behalf, and all other persons having actual knowledge of this Order, be and hereby are enjoined and restrained from commencing any action or proceeding of any kind against any defendant (or against any of their respective related parties or affiliates) in any proceeding presently or hereinafter assigned or transferred to this Court pursuant to 28 U.S.C. § 1407 for inclusion in the coordinated and/or consolidated pretrial proceedings in *MDL 581—In re Baldwin-United Corporation* (hereinafter referred to as "any proceeding under MDL 581"), which action or proceeding purports to be in the name of, on behalf of or derivative of the rights of any plaintiff or purported class member in any proceeding under MDL 581, or which action or proceeding may in any way affect the rights of any plaintiff or purported class member in any proceeding under MDL 581, or which action or proceeding seeks money damages arising out of the sale to any plaintiff or to any purported class members in any proceeding under MDL 581 of single premium deferred annuities of insurance subsidiaries of Baldwin-United Corporation by any defendant in any proceeding under MDL 581, or which action or proceeding seeks any declaratory relief with respect to any of the above; and

"IT IS HEREBY FURTHER ORDERED THAT, in accordance with this Court's decision on February 26, 1985, this injunction and restraint shall not extend to the commencement of any action or proceeding which seeks prospective injunctive relief as to any unlawful business practice on the part of any defendant in any proceeding under MDL 581 with respect to the sale of single premium deferred annuities of insurance subsidiaries of Baldwin-United Corporation, or which seeks to exercise in any way all other state law enforcement and regulatory powers, so long as any such action or proceeding, if any there be, does not seek to in any way affect the rights of any plaintiff or purported class member in any proceeding under MDL 581; and

"IT IS HEREBY FURTHER ORDERED THAT, in accordance with this Court's decision on February 26, 1985, this injunction and restraint will continue pending the further action of this Court, or pending the entry of final judgment in all of the proceedings under MDL 581, or pending such other and further order as this Court may make, and that application for modification of this injunction and restraint as it may relate to any non-party class members in any proceeding under MDL 581 may be made at such time as this Court may deny class action status in any proceeding under MDL 581 and such application, if made, shall be upon ten business days' written notice fully served upon all affected parties and served by hand upon counsel for the moving parties herein.

"IT IS SO ORDERED.

Dated: New York, New York

March 19, 1985

/s/ Charles L. Brieant
 U.S.D.J.